**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 08-CV-02558-CMA

FRANCES E. RIDER,

      Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

      Defendant.

---

### ORDER REGARDING DECISION OF ADMINISTRATIVE LAW JUDGE

---

      Pursuant to 42 U.S.C. § 405(g), Plaintiff Frances Rider appeals from the denial of

disability benefits by the Social Security Commissioner ("Commissioner").  After a

hearing on Plaintiff's application, the Administrative Law Judge ("ALJ") found that

Plaintiff was not disabled within the meaning of the Social Security Act ("Act") because

Plaintiff could perform gainful work within the regional and national economies despite

her impairments.

### BACKGROUND

      Plaintiff alleges that she suffers from multiple sclerosis ("MS") and depression

which have left her severely fatigued and affected her cognitive abilities.  Plaintiff filed

an application for disability benefits on October 2, 2002, alleging that she had been

disabled since June 21, 2002 (the "2002 Application").[1]  After an administrative hearing, the Commissioner denied this application in a written decision on July 6, 2004. (Administrative Record ("Admin"). at 33-43.)  Plaintiff filed her present application on October 26, 2004, again alleging that she became disabled on June 21, 2002.  (*Id.* 21.) On June 14, 2005, the state Disability Determination Services ("DDS") issued a decision finding Plaintiff disabled, but finding that Plaintiff's disability onset date was March 25, 2005, Plaintiff's 55th birthday, and six days prior to the date that her insured status for benefits expired.  (*Id.* at 53-56.)  Notwithstanding the marginally favorable DDS decision, Plaintiff requested a hearing before the ALJ.  At the hearing, Plaintiff sought to move the onset date of her disability back to 2002, rather than 2005.

## I.   MEDICAL HISTORY

Plaintiff was born March 25, 1950.  (*Id.* at 92.)  She has a college education, has been married twice, and lives with her grown son and his family.

Plaintiff received general medical care at the Salud Family Health Center in Ft. Collins, Colorado.  Records from Salud reflect that Plaintiff was diagnosed with MS in the mid-1990s, but, for much of the time since then, was not actively seeking treatment for the disease.  (*Id.* at 178.)  A May 2004 record stated that Plaintiff's "[m]edical exam is really unimpressive" and that her "[v]ital signs are stable."  Notwithstanding the

---

[1]   In her 2002 Application, Plaintiff alleged that she suffered from additional ailments, *e.g.*, a stomach ulcer, abdominal pain, and obesity.  However, she does not raise those impairments as grounds for relief in her present application.

doctors' benign impressions, Plaintiff reported that she had "severe physical and mental fatigue" that she felt precluded her from working.  (*Id.*)

Medical records indicate that Plaintiff attempted to commit suicide in September 2004 by taking an overdose of Zoloft and Tylenol PM.  (*Id.* at 184.)  She was admitted to McKee Medical Center and treated for her intentional overdose with charcoal and mucomyst, a drug used to treat Tylenol overdoses.  (*Id.* at 185.)  Dr. Joel Parliament at McKee noted that Plaintiff had a history of depression (she had attempted suicide once before, approximately thirty years earlier) and that her 2004 attempt was related to her feelings about her MS and her financial situation.  (*Id.*)

Plaintiff remained under medical/psychiatric care for four days following her September 2004 suicide attempt.  Records from her treatment immediately following the overdose reflect that Plaintiff recovered well physically.  For example, on September 16, 2004, Dr. Enrique Alvarez noted that Plaintiff was essentially asymptomatic (Plaintiff had no headache, back, neck, chest, or abdominal pains, visual changes, skin lesions, muscle weakness, or neurologic changes).  (*Id.* at 202.)  However, doctors were concerned about Plaintiff's mental health after the incident and they recommended follow-up counseling and treatment with Zoloft, as well as other drugs for her stomach problems.  (*Id.* at 184 & 201.)

In October 2004, Plaintiff sought to establish a treatment relationship at the Family Medicine Center.  She saw Drs. Julie Stansloski and Donna Sullivan on October 19, 2004.  (*Id.* at 214-17.)  Plaintiff reported that her MS symptoms, including visual

disruption in her left eye, increasing fatigue, and cognitive symptoms, had been increasing in severity in the last five years.  (*Id.* at 214.)  Plaintiff denied suicidal ideation, but indicated that she "continues to feel down and like she might be better off [dead]."  (*Id.*)  Upon a physical exam, Drs. Stansloski and Sullivan noted that Plaintiff was "alert and oriented, in no apparent distress," Plaintiff had a normal range of motion, normal strength and sensation, and "2+" (*i.e.*, normal) reflexes throughout.  (*Id.* at 216.) Drs. Stansloski and Sullivan noted that Plaintiff was "seeing a counselor frequently" for her mental health issues and they discussed additional counseling options.  They also referred Plaintiff to Dr. Timothy Allen, a neurologist, to follow up on her concerns regarding MS.

In November 2004, Plaintiff sought treatment for her MS from Dr. Allen.  After a physical exam, Dr. Allen conclude that Plaintiff's "[h]igher cortical functions including orientation to time, place and person, recent and remote memory, attention span, concentration, language and fund of knowledge are all normal and commensurate with education."  (*Id.* at 226.)  He also found that Plaintiff's reflexes, gait, coordination, and sensation were normal.  (*Id.*)

Dr. Allen also conducted and/or reviewed two laboratory tests.  He reviewed a brain MRI and found multiple lesions (indicative of MS), but found that the lesions were not "enhancing to indicate acute activity right now."  (*Id.* at 222 & 223.)  One month later, in December 2004, Dr. Allen conducted a "pattern-shift visual evoked potential study" that revealed "slight delays bilaterally in the P100 as well as more anterior peaks,

indicative of anterior visual system dysfunction bilaterally." (*Id.* at 207.)  However, Dr. Allen noted that Plaintiff's visual dysfunction was "mild at present." (*Id.*)  Dr. Allen and Plaintiff decided to try an IV steroid treatment for the optic neuritis, which Plaintiff thought was "a good idea," but she did not want to start immunomodulating therapy on a regular basis because of concerns about side effects of the MS drugs and her depression.  (*Id.* at 221.)

The administrative record also contains information from non-treating sources regarding Plaintiff's physical functioning.  For example, a Physical Residual Functional Capacity Assessment completed by the state found that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for six hours out of an eight-hour-day, sit for six hours out of an eight-hour-day, was unlimited in her ability to push or pull (*i.e.*, operate hand and/or foot controls), had no postural, manipulative, visual, or communicative limitations, and mild aversion to extreme heat or cold.  (*Id.* at 162-69.) Dr. Bruce Lipetz completed a review of the Physical Residual Functional Capacity Assessment and checked boxes reflecting his agreement with the state decision maker on all areas of Plaintiff's physical functioning.  (*Id.* at 174.)

Forms completed by Plaintiff describe more severe symptoms.  In a Disability Report form, Plaintiff stated that she had been fired from each of her most recent jobs because of absenteeism and inappropriate behavior around coworkers.  (*Id.* at 101.) She stated that her MS and depression left her exhausted "most of the time," she had numbness and tingling in her hands, and her visual disruption prevented her from

5

reading.  (*Id.*)  In a Personal Pain Questionnaire, Plaintiff stated that her hand, arms, and legs ached, sometimes for one-half hour and sometimes periods lasting days.  (*Id.* at 119.)  She stated that she treated her pain with over-the-counter Tylenol, Zoloft, and self-massage, but that the pain still limited all aspects of her life.  (*Id.* at 119-20.)  Plaintiff alleged that she needed to sleep for two to three hours during the day and did not bathe every day because it required too much energy.  (*Id.* at 122.)  However, Plaintiff could still feed herself, fold laundry, shop for groceries, and play with her grandchildren, although these activities required lots of breaks.  (*Id.* at 122-24.)

Various reports in the administrative record offer a glimpse of Plaintiff's mental health situation.  Dr. Brian Wise, a state-appointed examiner, reviewed Plaintiff's records and examined Plaintiff once on April 9, 2005, before issuing his report.  (*Id.* at 228-32.)  Dr. Wise recounted many of Plaintiff's alleged symptoms in his report and noted that they were consistent with his own observations of Plaintiff's behavior.  For example, he found Plaintiff to be cooperative, but he noted that she displayed mild pain symptoms and that her "thought process was for the most part organized and clear but she occasionally got a little bit confused or disorganized in answering a couple of questions."  (*Id.* at 230.)

Other information in the administrative record is likewise less than equivocal. A Mental Residual Functional Capacity Assessment completed by Dr. Ellen Ryan found that Plaintiff had moderate limitations in certain areas of functioning, *e.g.*, the ability to interact appropriately with the general public, accept instructions and respond

appropriately to criticism, get along with coworkers, and maintain socially appropriate behavior and standards of neatness and cleanliness.  (*Id.* at 145.)  Dr. Ryan also completed a Psychiatric Review Technique in which she diagnosed Plaintiff with cognitive disorder, major depression, and adjustment disorder with mixed depressive and anxiety features.  (*Id.* at 148-61.)  On the Review Technique form, Dr. Ryan checked boxes indicating that Plaintiff's mental health impairments caused her mild restrictions on her activities of daily living, moderate difficulties in social functioning, and mild to moderate difficulties in maintaining concentration, persistence, or pace.  (*Id.* at 158.)  Dr. Lipetz completed forms reviewing Dr. Ryan's Psychiatric Review Technique and Mental Residual Functional Capacity Assessment and checked boxes reflecting that he agreed with Dr. Ryan's conclusions on all accounts.  (*Id.* at 170-73.)

Jill Vogt, a licensed clinical social worker who saw Plaintiff after her suicide attempt, wrote a letter to the Colorado Department of Human Services that essentially parrots Plaintiff's alleged symptoms without offering any additional objectively verifiable medical information.  (*Id.* at 227.)

## II.   PROCEDURAL HISTORY

As noted above, this is not Plaintiff's first application for disability benefits; she also filed for benefits in 2002 and possibly before then, as well.[2]  Regarding the 2002 Application, after an ALJ hearing, the Commissioner denied it by a written decision

---

[2]   In fact, Plaintiff states in her Opening Brief that she originally filed for benefits in 1998. (Doc. # 19 at 3.)

dated July 6, 2004.  (*Id.* at 33-43.)  Plaintiff did not appeal the decision denying the 2002 Application.

Plaintiff filed the instant application on October 26, 2004, once again alleging that she became disabled in June 2002.  On June 14, 2005, DDS awarded Plaintiff benefits, but found that she did not become disabled until March 25, 2005, only six days before her insured status expired.  Plaintiff appealed the DDS decision and requested a hearing before an ALJ, which was held on July 20, 2006.  (*Id.* at 240-83.)  The ALJ (a different ALJ than the one who presided over the 2002 Application) issued a written decision finding Plaintiff not disabled on October 25, 2006.  (*Id.* at 18.)  Plaintiff appealed, but the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the final administrative action.

A.     The ALJ Hearing

Two witnesses testified at the hearing:  Plaintiff appeared *pro se* along with a vocational expert, Debra Christensen.  The ALJ opened the hearing by notifying Plaintiff that she had a right to have an attorney, which Plaintiff acknowledged.  (*Id.* at 242-43.) The ALJ then repeatedly and explicitly warned Plaintiff that he was not bound by the favorable DDS decision and that if the ALJ thought the evidence in the record suggested a finding of not disabled, he would render a decision different from DDS. (*Id.* at 243-252.)[3]  Although Plaintiff expressed some concern at the choice the ALJ

_____

[3]  The ALJ also briefly explained that he considered Plaintiff's 2002 Application *res judicata*, and that he would not re-open that decision.  (*Id.* at 245.)

presented her (cancel the hearing or go forward and risk losing the favorable DDS decision), she decided to press forward with her appeal. (*Id.*)

The ALJ then moved into questions regarding Plaintiff's job history. (*Id.* at 255.) Plaintiff described her prior work as an employment and training counselor with a federal job training program. (*Id.* at 255-56.) Plaintiff stated that she counseled and trained low income clients (mostly women who had been widowed or divorced) with the goal of allowing the clients to obtain jobs. (*Id.* at 256-58.) This job varied considerably in its physical demands, but Plaintiff stated that it usually involved four to five hours of either standing, walking, and/or sitting in a given work day. (*Id.* at 258-59.) Plaintiff also recalled that she sold cosmetics for a large department store chain in 2001, which was her only retail work experience. (*Id.* at 259-60.) Following the retail job, which lasted seven months, Plaintiff worked as a director of a recreation facility for the Boys and Girls' Clubs of Larimer County. (*Id.* at 260.) Plaintiff supervised a staff of seven employees and up 150 children per day in after-school programs. (*Id.* at 261.) Following the Boys and Girls' Club position, Plaintiff worked as a office assistant for a civil engineering firm. (*Id.* at 262.) At this job, Plaintiff scheduled the engineers, answered office phones, and performed general clerical duties. (*Id.* at 263.) Plaintiff stated that she was fired from both the Boys and Girls' Club and engineering firm jobs because of inappropriate behavior with coworkers, which Plaintiff claims resulted from her MS. (*Id.* at 264.)

Plaintiff then testified regarding her more recent daily activities and her alleged symptoms.  She stated that she was slow to get out of bed in the morning because of pain and numbness in her arms, legs, and hands (*id.* at 265); spent roughly half of her days in bed because the pain and fatigue from her MS (*id.* at 266-67); occasionally went to the grocery store for basic items (*id.* at 267); and had problems with getting lost and forgetting directions.  (*Id.* at 269.)  She described how she moved in with her grown son and that on certain days the pain and fatigue were so bad that she could not climb the stairs out of her basement room.  (*Id.* at 265.)  She also described problems with her vision, especially in her left eye.  (*Id.* at 274-75.)

Next, the ALJ examined Ms. Christensen.  Ms. Christensen first described her education and work background – a Master's Degree in Rehabilitation Counseling and work with individuals who have physical or mental limitations – before moving on to substantive testimony.  (*Id.* at 270.)  Ms. Christensen testified regarding the Dictionary of Occupational Titles ("DOT") ratings for Plaintiff's previous jobs, *e.g.*, Ms. Christensen testified that the employment counselor position had skill level of seven (skilled) and a sedentary exertional level, although she described the exertional level as light under the circumstances described by Plaintiff, the Boys and Girls' Club job had a skill level of seven and a light exertional level, the clerical work at the engineering firm had a skill level of four (semi-skilled) and an exertional level of sedentary.

The ALJ then asked Ms. Christensen a series of hypothetical questions. In response to the first hypothetical, Ms. Christensen stated that a 54- to 56-year-old

10

person with a bachelor's degree and Plaintiff's work history who was bedridden 50-percent of the time would be precluded from all employment.  (*Id.* at 272.)  The ALJ then asked Ms. Christensen about a person with the same age, education, work history, but who was limited to light exertion, *i.e.*, the ability to lift and carry ten pounds frequently, twenty pounds occasionally, to sit, stand, or walk for six hours out of an eight-hour day, but who must avoid temperature extremes, is limited to lower-level semi-skilled tasks that can be learned in up to three months, and is limited in interpersonal contact.  *Id.* Ms. Christensen found three jobs that this hypothetical person could perform – general clerk, file clerk, and typist.  (*Id.* at 273-274.)  In response to a further clarifying question from the ALJ, Ms. Christensen stated that non-skilled jobs existed for the hypothetical person described by the ALJ, including an assembler of small products, housekeeper, and inspector and hand packager.  After a brief discussion with Plaintiff regarding Ms. Christensen's role in the disability determination process, the ALJ asked more hypothetical questions.  This time, the ALJ dropped the restrictions on interpersonal interactions and asked about a person with additional physical limitations, *e.g.*, standing and walking would be limited to four hours per day, no balancing or climbing, no exposure to dangerous machinery, temperature extremes, excessive vibration, no repetitive use of foot controls, and only occasional stooping, crouching, kneeling, and crawling.  (*Id.* at 277.)  Ms. Christensen responded that such a person could perform all of Plaintiff's previous jobs and, alternatively, if that same person were limited to semi-skilled work, the receptionist position would remain.  (*Id.* at 278.)  When the ALJ re-

introduced the interpersonal communications restriction into the hypothetical, Ms.

Christensen eliminated the receptionist position, but noted that the general clerk, typist,

and assembler position remained available, although the assembler position would be

eroded by twenty-five to fifty percent.  (*Id.* at 279-80.)

     B.    <u>The ALJ's Written Decision</u>

On October 25, 2006, the ALJ issued a written decision denying Plaintiff's

application.  (*Id.* at 21-32.)  The ALJ opened his decision with a concise description of

the procedural history of this case, including Plaintiff's 2002 Application.  (*Id.* at 21.)

He then described the applicable law in some detail, including the five-step disability

determination process, the method for deciding the weight to give to medical opinions,

and the burden to establish the availability of jobs in the economy.  (*Id.* at 24-25.)

The ALJ then provided thirteen findings of fact and conclusions of law.  Of note,

the ALJ found that Plaintiff had not presented any reason to re-open the 2002

Application.  (*Id.* at 27.)  Thus, the ALJ only considered whether Plaintiff could establish

a disability between July 7, 2004, and March 31, 2005, the last date that Plaintiff met

insured status requirements.  (*Id.*)  The ALJ also found that Plaintiff had not engaged in

substantial gainful activity since July 7, 2004, and had three severe impairments, MS,

cognitive disorder, and major depression.  (*Id.* at 25-26.)  However, the ALJ concluded

that these impairments did not meet or equal any of the listed impairments.  (*Id.*)

The ALJ described two distinct residual functional capacities ("RFCs"), one RFC

for the period between July 7, 2004, and September 13, 2004, and a second RFC for

the period between September 14, 2004, and March 31, 2005.  (*Id.* at 26.)  In the earlier

RFC period, the ALJ concluded that Plaintiff could frequently lift ten pounds,

occasionally lift twenty pounds, sit for eight hours per day, stand and/or walk for four

hours per day in a job that allowed for regular postural shifts, could not climb or balance,

and should avoid temperature extremes, dangerous machinery, excessive vibration,

could not operate repetitive foot controls, but that she could occasionally stoop, crouch,

kneel, and crawl, and that she could perform semi-skilled work, but that she had

moderate limitations on her ability to respond appropriately to work pressures and

changes in job routine.  (*Id.* at 26.)  For the later RFC period, the ALJ found identical

physical, postural, and environmental limitations, but he added that she was restricted

to lower semi-skilled instructions and that she should have only limited interpersonal

contact.  (*Id.*)  Thus, the ALJ's second RFC limited Plaintiff to occasional contact with

coworkers and supervisors and precluded Plaintiff from any jobs that involved

interaction with the general public.  (*Id.*)

        In making these RFC determinations, the ALJ stated that he considered all of

Plaintiff's symptoms to the extent they were consistent with the objective medical

evidence.  (*Id.*)  The ALJ found that the earlier written decision from Plaintiff's 2002

Application best described Plaintiff's physical limitations.[4]  (*Id.* at 29.)  The ALJ

---

        [4]   This is not to say that the ALJ completely ignored the medical evidence in the record
regarding Plaintiff's physical functional capacity.  Indeed, the ALJ described the medical evi-
dence in the record, including reports and documents from Drs. Alvarez, Sullivan, and Allen, but
he found that the evidence in the record regarding Plaintiff's physical limitations corresponded
with the decision from the 2002 Application, so the ALJ declined to alter the physical limitations
contained in the 2002 RFC assessment.  (*Id.* at 27-28, 29.)

concluded that Dr. Allen's records showed that Plaintiff's physical condition had not worsened (or improved) since the earlier decision.  However he noted that her mental health had changed, and he found Dr. Ryan, the state agency psychologist, made the best assessment of Plaintiff's mental functional capacity.  The ALJ also took note of the letter from Ms. Vogt, but concluded that Ms. Vogt was not an acceptable medical source and that her opinion contradicted Dr. Allen's opinion.  (*Id.* at 28.)

The ALJ also declined to accept portions of Dr. Wise's opinion, specifically Dr. Wise's statement that Plaintiff "can't be gainfully employed" (*Id.*)  As a basis for rejecting this opinion, the ALJ incorrectly noted that Dr. Wise was a psychologist, not a physician and, thus, found the opinions regarding Plaintiff's physical capabilities to be outside of Dr. Wise's specialty.  (*Id.*)  The ALJ also rejected Dr. Wise's opinion that Plaintiff had moderate to marked limitations in social functioning as unsupported by objective clinical evidence.  (*Id.* at 29.)  Nonetheless, the ALJ gave some weight to Dr. Wise's opinion that Plaintiff had cognitive difficulties that affected her ability to interact with others.  The ALJ found this opinion to be consistent with Dr. Ryan's opinions which, in turn, were echoed by Dr. Lipetz.  (*Id.* at 28-29.)

The ALJ concluded that Plaintiff's own testimony regarding the severity of her symptoms was not credible.  (*Id.* at 29.)  The ALJ noted that Plaintiff's alleged symptoms lacked objective medical support.  The ALJ also found that Plaintiff lacked credibility because she was inconsistent in her statements to her doctors regarding the cause of the disabling impairment on which she based her disability claim.  (*Id.*)

The ALJ's decision then discussed the final steps of the five-step process and concluded that Plaintiff could perform her past relevant work as a receptionist for the period between July 4, 2004, and September 13, 2004.  (*Id.* at 30.)  Thus, he found her not disabled during that period.  As for the period between September 14, 2004, and March 24, 2005, Plaintiff's 55th birthday, the ALJ relied on Ms. Christensen's testimony to find that Plaintiff could perform the jobs of assembler, housekeeper, and inspector, which existed in significant numbers within the regional and national economies.  (*Id.* at 31.)  The ALJ concluded that, as of March 25, 2005, Plaintiff had skills that were transferable, and that from March 25, 2005, through the end of her insured status, Plaintiff could perform the jobs of general clerk and typist.  (*Id.* at 32.)  As such, the ALJ ultimately disagreed with DDS and found that Plaintiff was not disabled within the meaning of the Act.  (*Id.*)

## STANDARD OF REVIEW

Section 405(g) of the Social Security Act establishes the scope of this Court's review of the Commissioner's denial of disability benefits.  *See* 42 U.S.C. § 1383(c)(3) (incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides, in relevant part, that:

> [t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner of Social Security or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing before the Commissioner of Social Security, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under subsection (a) of this

section, the court shall review only the question of conformity with such regulations and the validity of such regulations.

42 U.S.C. § 405(g).  Thus, this Court's review is limited to determining whether the record as a whole contains substantial evidence supporting the Commissioner's decision.  *See* § 405(g); *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992).  The Court must uphold the Commissioner's decision if it is supported by substantial evidence.  See *Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987).  This Court cannot re-weigh the evidence nor substitute its judgment for that of the ALJ.  *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987).  That does not mean, however, that review is merely cursory.  To find that the ALJ's decision is supported by substantial evidence, the record must include sufficient relevant evidence that a reasonable person might deem adequate to support the ultimate conclusion. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987).  A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it.  *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985).  The ALJ's decision is also subject to reversal for application of the wrong legal standard.  *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

The Court will also note that since Plaintiff is proceeding *pro se*, the Court will generously construe Plaintiff's pleadings and hold them to a lesser standard than if they were drafted by lawyers.  *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

## ANALYSIS

Under the standard of review described above and the applicable law described below, the Court will affirm and adopt the ALJ's decision.

## I.   APPLICABLE LAW

A claimant must qualify for disability benefits under the Act.  To do so, the claimant must meet the insured status requirements, be less than sixty-five years of age, and under a "disability."  *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A). In proving disability, a claimant must make a prima facie showing that she is unable to return to the prior work she has performed.  *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).  Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs the claimant could perform.  *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability benefits.  *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing five-step analysis).  A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the subsequent steps may be disregarded.  *See* 20 C.F.R. § 404.1520(a); *Williams v.*

*Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).  First, the claimant must demonstrate that she is not currently involved in any substantial gainful activity.  20 C.F.R. § 404.1520(b).  Second, the claimant must show a medically severe impairment (or combination of impairments) which limits her physical or mental ability to do basic work activities. § 404.1520(c).  At the third step, if the impairment matches or is equivalent to established listings, then the claimant is judged conclusively disabled.  § 404.1520(d).  If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step.  At this stage, the claimant must show that the impairment prevents her from performing work she has performed in the past.  *See Williams*, 844 F.2d at 751 (citations omitted).  If the claimant is able to perform she previous work, she is not disabled.  20 C.F.R. § 404.1520(e); *Williams*, 844 F.2d at 751.  The fifth step requires the Commissioner to demonstrate that:  (1) the claimant has the RFC to perform other work based on the claimant's age, education, past work experience; and (2) there is availability of that type of work in the national economy.  *See*  20 C.F.R. § 404.1520(f); *Williams*, 844 F.2d at 751.

## II.    THE ALJ'S TREATMENT OF THE MEDICAL OPINION EVIDENCE

First, Plaintiff challenges the ALJ's treatment of the medical opinions in the record.  However, the Court finds that the ALJ correctly interpreted the available medical evidence.

A.     Treating Medical Opinions Are Typically Given Controlling Weight.

The ALJ has the sole responsibility for determining a claimant's RFC based on the entirety of the evidence.  *See Valley v. Sullivan*, 908 F.2d 585, 587 (10th Cir. 1990). In discharging that duty, the ALJ should give a treating physician's opinion regarding "the nature and extent of a claimant's disability . . . 'controlling weight' when it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with other substantial evidence in [the claimant's] case record.'"  *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003) (quoting 20 C.F.R. § 416.927(d)(2)) (alterations in original); *see also Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).  If the ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ must "give good reasons" for the weight given to a treating physician's opinion.  20 C.F.R. § 416.927(d)(2); *see also Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (requiring ALJ to supply "specific, legitimate reasons" for rejecting opinion of treating physician).  However, the ALJ does not have to provide a formulaic recitation of every reason that he discounts a treating physician's opinion.  *See Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

B.     Physical Limitations In The ALJ's RFC Assessment Are Supported By Substantial Evidence.

Plaintiff argues that she only saw Dr. Alvarez once in the immediate aftermath of her suicide attempt, she only saw Drs. Sullivan and Stansloski to establish herself as a new patient, not for therapeutic care, and that Dr. Stansloski was an intern supervised

by Dr. Sullivan.  Thus, Plaintiff contends that the ALJ erred in using these doctors' opinions as the basis for the physical limitation component of his RFC conclusion.

However, regardless of the frequency of Plaintiff's visits to Drs. Alvarez, Sullivan, and Stansloski, the ALJ's RFC conclusion regarding Plaintiff's physical limitations is supported by substantial evidence.  For example, physical examinations by doctors at McKee immediately after Plaintiff's suicide attempt found no lingering physical limitations from Plaintiff's intentional overdose.  Drs. Sullivan and Stansloski also performed a physical evaluation of Plaintiff during which they found Plaintiff had a normal range of motion, strength, sensation, and reflexes.  Although Plaintiff may not have visited Drs. Alvarez, Stansloski, or Sullivan on a regular basis, these doctors are still acceptable medical sources under the Act.  *See* 20 C.F.R. §§ 404.1527(a)(2), (d), and 416.927(a)(2), (d).  Moreover, Dr. Allen, a treating source who saw Plaintiff on repeated occasions, did not place any physical restrictions on Plaintiff.  In fact, with the exception of "mild" visual dysfunction, Plaintiff's medical providers did not describe any physical limitations that Plaintiff suffered as a result of her MS or depression.[5]

To the extent that the doctors' reports provide support for Plaintiff's alleged physical limitations, such reports are merely Plaintiff's own statements that have been recorded by her treating professionals.  As such, they are not true medical evidence and the ALJ properly rejected those statements because they are inconsistent with the

_____

[5]   Plaintiff contends that she suffers from carpal tunnel syndrome, which limits her manipulative abilities, but there is no objective medical evidence in the record to support this impairment.

objective, medical evidence like Plaintiff's test results and examinations. The ALJ also

correctly rejected Ms. Vogt's statements regarding Plaintiff's alleged physical limitations

because Ms. Vogt is a social worker, not a medical professional, and her opinions

regarding Plaintiff's physical limitations fall outside her professional expertise. *See* 20

C.F.R. §§ 404.1527(a)(2), (d), & 416.927(a)(2), (d). Moreover, certain of Ms. Vogt's

opinions are inconsistent with Dr. Allen's objective, medically-supported opinions.

C.     Mental Limitations In The ALJ's RFC Assessment Are Supported By Substantial Evidence.

Plaintiff also argues that the ALJ erred in assessing her mental functional

capacities. However, the Court finds that the ALJ's decision on this issue is supported

by substantial evidence.

Plaintiff contends that the ALJ erred by giving the opinion of Dr. Ryan more

weight than the opinion of Dr. Wise. However, Dr. Ryan was an acceptable medical

source and her opinions were confirmed by Dr. Lipetz.[6] Dr. Ryan's opinions are also

consistent with and supported by substantial evidence in the record. For example,

Ms. Vogt noted that Plaintiff's depressive symptoms had lessened in the months

following her suicide attempt. Drs. Sullivan and Stansloski made a similar notation

in their report, stating that Plaintiff was seeing a counselor frequently and that Zoloft

seemed to work to treat her depressive symptoms. Thus, Plaintiff's depression did not

appear to be causing severe mental functional limitations. Likewise, the record contains

---

[6]   Even if the ALJ erred in labeling Dr. Wise a psychologist, the error was harmless because the ALJ's decision to give less than controlling weight to Dr. Wise's opinions is supported by other evidence in the record.

repeated references to Plaintiff's cognition as being "alert" and appropriate.  Even Dr. Wise's report reflects only mild errors in mathematical calculation, not a functionally-limiting failure of cognition.

Regarding Dr. Wise's opinion that Plaintiff behaved inappropriately in social situations, this opinion lacks objective medical evidence.  Like other notes in the records, this opinion is essentially founded on Plaintiff's own, un-corroborated allegations, not on objective medical testing.  This opinion is also contradicted by the record evidence of Plaintiff's behavior.  For example, Dr. Wise noted that Plaintiff was cooperative and pleasant during his examination and Drs. Sullivan and Stansloski made similar notes.  Additionally, the ALJ did not completely reject the notion that Plaintiff suffered some mental functional limitations.  To the contrary, in his post-September 2004-RFC, he noted that Plaintiff should minimize interpersonal communications with coworkers and supervisors and avoid all interpersonal interaction with the general public.

Further, as the Commissioner points out, Dr. Wise was not a treating physician, but rather, was a consulting physician.  So, under the Act, the ALJ need not accord Dr. Wise's opinion controlling weight.  *See* 20 C.F.R. §§ 404.1527(d), & 416.927(d).  Moreover, the ALJ correctly rejected Dr. Wise's opinion that Plaintiff "can't be gainfully employed," because that is not a true medical opinion and it intrudes upon the province of the ALJ and the Commissioner, who are ultimately responsible for determining the question of disability.  *See* 20 C.F.R. §§ 404.1527(d) & 416.927(d).

In short, the ALJ correctly assessed the medical evidence in the record under the appropriate legal standards and the ALJ's two-fold RFC assessment is supported by substantial evidence.

## III.   THE ALJ'S DETERMINATION OF PLAINTIFF'S CREDIBILITY

The ALJ concluded that Plaintiff's testimony regarding her own physical and mental limitations was not credible because, in part, it was inconsistent with medical evidence in the record.  Plaintiff contends this was an error, but the Court finds that the ALJ's credibility determination is supported by substantial evidence.

As noted above, Plaintiff's testimony is at odds with the lack of restrictions and/or limitations found by her doctors.  In fact, the medical evidence reflects that Plaintiff's physical functional capacity was normal or close to normal.  For example, Drs. Sullivan and Stansloski examined Plaintiff and found that Plaintiff had a normal range of motion, normal strength and sensation, and "2+" (*i.e.*, normal) reflexes throughout.  This finding is echoed by Dr. Alvarez and others in the record.  Thus, Plaintiff's allegations that she suffered from debilitating fatigue and numbness and a lack of sensation in her extremities is contradicted by the medical evidence in the record.

The ALJ's decision on Plaintiff's credibility is reinforced by other inconsistencies in Plaintiff's testimony.  For example, Plaintiff stated that her pain prevented her from sitting, standing, or walking for extended periods of time, but she took only over-the-counter Tylenol to treat her symptoms.  As the ALJ recognized, the disconnect between Plaintiff's alleged symptoms and her lack of effort to treat those symptoms undercuts

her credibility.  *See, e.g., Campbell v. Bowen*, 822 F.2d 1518, 1522 (10th Cir. 1987)

(failure to use prescription pain medication contradicted claimant's allegations of

debilitating pain).  Plaintiff also told the ALJ that she needed to sleep thirteen or

fourteen hours per day.  However, aside from brief mentions of fatigue, Plaintiff's

complaints of severe fatigue do not appear anywhere in the medical records.

These types of inconsistencies support the ALJ's decision to discredit Plaintiff's

testimony regarding her functional limitations and the Court will not disturb that decision

on appeal.

## IV.   THE ALJ PROPERLY CONCLUDED THAT PLAINTIFF COULD PERFORM WORK THAT EXISTS IN SIGNIFICANT NUMBERS THE NATIONAL ECONOMY

The ALJ concluded that, despite her functional limitations, Plaintiff could perform

various jobs that existed in significant numbers in the regional and national economies.

Plaintiff argues that the ALJ erred because he improperly relied on the Medical-

Vocational Guidelines to find that such jobs existed.  However, the Court disagrees.

Although the ALJ made reference to the Medical-Vocational Guidelines in his

written decision, he did so for explanatory purposes.  The actual basis for the ALJ's

conclusion that work existed for a person of Plaintiff's age, skills, education, and

functional capacities was Ms. Christensen's testimony.  Thus, Plaintiff is incorrect in

arguing that the ALJ erred by referencing the Medical-Vocational Guidelines despite

Plaintiff's non-exertional impairments.

24

Ms. Christensen also testified that Plaintiff had skills from her earlier work as a receptionist that Plaintiff could transfer to the jobs Ms. Christensen suggested were available for Plaintiff.[7]  Thus, in contrast to Plaintiff's argument, the ALJ did not violate Rule 202.00(c) in finding that work existed for Plaintiff in significant numbers in the regional or national economies.

Plaintiff also contends that the ALJ failed to meet his burden to establish that work existed in significant numbers.  There is no hard and fast rule as to what constitutes a significant number of jobs and courts should judge each case on its own facts.  *See Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992).  In this case, Ms. Christensen stated that 35,500 general clerk jobs existed in the United States (620 in Colorado) and that 36,000 typist jobs existed in the United States (365 in Colorado).  The Court concludes that over 70,000 available jobs constitutes a significant number under the facts of this case.  *See* 20 C.F.R. § 404.1566(a) & 416.966(a) (noting that it does not matter whether work exists in the immediate area where a claimant lives).  Thus, the Court concludes that the ALJ and the Commissioner have met their burden on this step of the disability analysis.

## CONCLUSION

For the reasons explained above, the Court concludes that the ALJ applied the correct legal standards and that his decision is supported by substantial evidence.

---

[7]   Plaintiff contends that the ALJ's finding on this issue contrasts with the DDS decision, but that does not merit reversal of the ALJ.  Indeed, as the ALJ repeatedly and correctly told Plaintiff, he was not bound by the DDS decision.

Accordingly,

The Court will AFFIRM the ALJ's decision.

DATED:  October __5__, 2009

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge